## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MUHAMMAD MUNIR** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:10-cv-0855** |
| | : | **(JUDGE MARIANI)** |
| **POTTSVILLE AREA SCHOOL DISTRICT** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM OPINION

Plaintiff Muhammad Munir ("Plaintiff"), individually and as the parent of minor

Plaintiff, O.M. ("O.M." or "Student"), filed this action against Defendant Pottsville Area

School District ("Defendant") for alleged violations of the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Plaintiff specifically alleges that

Defendant failed to timely evaluate O.M. and provide him with a free appropriate public

education ("FAPE"). Plaintiff's Complaint seeks compensatory education for O.M. from the

beginning of the 2007-2008 school year through December 2008, as well as tuition

reimbursement for the costs of O.M.'s private school placement from January 2009 through

the conclusion of the 2009-2010 academic year. The instant action was filed after Plaintiff

failed to receive the relief he requested through various administrative channels.

A due process hearing was conducted over the course of several sessions in both

November and December of 2009. On January 23, 2010, a Hearing Officer issued a written

Decision and Order denying all relief requested by Plaintiff in the Due Process Complaint

Notice. Plaintiff filed his Complaint (Doc. 1) in this matter as an appeal from the Hearing

Officer's Decision on April 21, 2010. The federal Complaint contains one count for alleged

violations of the IDEA. Defendant filed a timely answer, and in a Case Management Order

dated January 11, 2011, Judge James M. Munley ordered that all dispositive motions be

filed on or before May 1, 2011 (Doc. 17).

On April 29, 2011, Defendant filed a Motion for Summary Judgment, along with a

Statement of Material Facts and a supporting brief. (Docs. 23, 24, and 25.) On May 20,

2011, nearly three weeks after the expiration of the period for filing dispositive motions,

Plaintiff filed a Cross-Motion for Summary Judgment and Request for the Court to Consider

Additional Evidence, a Statement of Material Facts, and a supporting brief. (Docs. 28, 29

and 30.) Defendant did not file a brief in opposition to Plaintiff's Cross-Motion for Summary

Judgment, but instead filed a Motion to Strike Plaintiff's Cross-Motion (Doc. 31).

On May 14, 2012, the Court issued an Order denying Defendant's Motion to Strike,

and deemed Plaintiff's Cross-Motion for Summary Judgment filed (Doc. 14). On May 17,

2012, the Court issued a second Order permitting the submission of additional evidence, but

only for the limited purpose of determining whether the decision of the Hearing Officer

should be modified or set aside for error. On May 23, 2012, the Court issued a subsequent

Order (Doc. 42) permitting the inclusion into the record of Defendant's expert report. The

matter is now ripe for adjudication based upon the parties' cross-motions for summary

judgment.

## I.     **STANDARD OF REVIEW**

This matter is presented to the district court as cross-motions for summary judgment.

The standard of review in an IDEA case "differs from that governing the typical review of

summary judgment." *K.H. o/b/o K.H. v. N. Hunterdon—Voorhees Reg'l High Sch.*

*Hunterdon Co.*, No. 05-4925, 2006 WL 2331106 (D.N.J. Aug. 10, 2006)(internal citations

omitted). "Where no new evidence has been presented to the Court, motions for summary

judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case

based on the administrative record." *Id.* The district court is permitted, however, to

consider additional evidence in its evaluation of the administrative decision. *See* 20 U.S.C.

§ 1415(i)(2)(C)(ii).

(A) Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be

granted if the "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." A district court

may grant a defendant's motion for summary judgment when the plaintiff fails to provide any

genuine issue of material fact. *See* Rule 56(c); *see also Krouse v. Amer. Sterilizer Co.*, 126

F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the burden to establish before the

district court that the non-moving party has failed to substantiate its claims with evidence.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see*

3

also *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir. 1990). "The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial." *See  Book v. Merski*, 2009 WL 890469, at *4 (W.D. Pa. Mar. 31, 2009)(citing *Matsushita Elec. Indus. Company v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989)("the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment.")).  The non-moving party is then charged with providing evidence beyond the pleadings to show specific facts by affidavit or by information contained "in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim." *Book*, 2009 WL 890469, at *4 (citing *Celotex*, 477 U.S. at 322; *Country Floors*, 930 F.2d at 1061).

Material facts are those whose resolution will affect the outcome of the case under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Although the Court is required to resolve any doubts as to the existence of material facts in favor of the non-moving party for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." *Firemen's Ins. Company of Newark, N.J. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Summary judgment, therefore, is only precluded if a dispute about

a material fact is "genuine", *viz.*, if the evidence would permit a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson*, 477 U.S. at 247-249.

    (B) Judgment on the Administrative Record

    A district court's "review of an administrative law judge's decision in an IDEA case is subject to a unique standard of review." *N.M. v. Central York Sch. Dist.*, No. 09-969, 2010 WL 4867552, at \*4 (M.D. Pa. Sept. 10, 2010). The language of IDEA requires that the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

    The United States Supreme Court has construed this language to require district courts to give "due weight" to the administrative proceedings, while being careful to avoid replacing its "own notion of sound educational policy for those of the school authorities [that] they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L. Ed. 2d 690 (1982). "Due weight" requires the district court to conduct a "modified *de novo* review," under which findings of fact from the administrative proceedings "are to be considered *prima facie* correct." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003)(quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995)).

A court may disagree with the facts found by a hearing officer, but must explain any such divergence from the administrative findings. *Id.* (citing *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002)). The district court is required to "defer to the ALJ's factual finding unless it can point to contrary non-testimonial extrinsic evidence in the record." *Id.* However, when a district court hears "additional evidence" under § 1415(i)(2)(C)(ii), the court is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." *Id.* (quoting *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1220 (3d Cir. 1993)). The district court's review of the administrative agency's findings of law is plenary, and no deference is given to the administrative law judge's legal holdings. *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999)(citations omitted).

## II.    **IDEA STATUTORY FRAMEWORK**

IDEA is a federal statute in which Congress sought to "increase the personal independence and enhance the productive capacities of handicapped citizens." *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 691 (3d Cir. 1981). In its most general terms, the IDEA provides federal funding for any state or local agency that demonstrates it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." *Rowley*, 458 U.S. at 180-81 (quoting 20 U.S.C. § 1412(1)). A "free appropriate public education" ("FAPE") must be "tailored to the unique needs of the handicapped child

6

by means of an [individualized education program]." *Id.* (citing 20 U.S.C. § 1401(18)). To be compliant, "[s]tate educational authorities must identify and evaluate disabled children, §§ 1414(a)-(c), develop an IEP for each one, § 1414(d)(2), and review every IEP at least once a year, § 1414(d)(4)." *Schaffer v. Weast*, 546 U.S. 49, 53 (2005).

In addition, IDEA requires disabled students to be educated in the "least restrictive environment," which means, "to the maximum extent appropriate . . . with children who are not disabled." *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006)(quoting 20 U.S.C. § 1412(a)(g)(A)). "When a state fails to provide a [FAPE], it must reimburse parents for resulting private school costs." *Id.* (citing *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)). "Parents who unilaterally withdraw their child from public school and place him or her in private school without consent from the school district 'do so at their own financial risk.'" *K.H., o/b/o B.Y. v. N. Hunterdon—Voorhees Reg'l High Sch.*, No. 05-4925, 2006 WL 2331106, at *2 (D.N.J. Aug. 10, 2006)(quoting *Sch. Comm. Of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1985)).

## III.   THE ADMINISTRATIVE RECORD AND DECISION

Following four days of hearings held on November 6, November 9, December 7, and December 16, 2009, Hearing Officer Anne L. Carroll, Esq. ("ALJ Carroll")[1] issued an Administrative Decision ("Administrative Decision") on January 23, 2010, containing both

---

[1] The title Hearing Officer is used interchangeably with the designation Administrative Law Judge ("ALJ") throughout this memorandum.  Accordingly, Hearing Officer Anne L. Carroll, Esq., is addressed as "ALJ Carroll."

findings of fact and legal conclusions. (*See* Administrative Decision, ECF Dkt. 23-10.) They are recounted below.

### ALJ Carroll's Findings of Fact[2]

Based upon the submissions and testimony of the parties, ALJ Carroll made 41 separate findings of fact. Under Third Circuit standards, these findings are entitled to "due weight," although the district court must evaluate the strength of the findings and provide reasons as to why any of them are disregarded or abrogated.

ALJ Carroll found that 17 year-old O.M. has a "diagnosis of emotional disturbance in accordance with Federal and state standards. (*See* Administrative Decision at ¶ 1 (citing 34 C.F.R. §300.8(a)(1), (c)(4); 22 Pa. Code § 14.102(2)(ii)).) ALJ Carroll also found that in early 2005, while O.M. was 13, he "required in-patient hospitalization due to threats of suicide and suicidal gestures." (*See* Administrative Decision at ¶ 3.)

ALJ Carroll further found that Defendant "submitted behavior rating evaluations to the hospital as requested, and on the hospital's recommendation, considered a psycho-education evaluation to determine whether O.M. was eligible for IDEA services by reason of a learning disability." (*See* Administrative Decision at ¶ 4.) ALJ Carroll noted that "[b]ased upon [O.M.'s] cognitive and achievement test scores, [Defendant] concluded that [O.M.] did not have a learning disability." (*See* Administrative Decision at ¶ 4.) She further noted that Defendant "also used the behavior ratings completed by [Defendant's] teachers and its

---

[2]The facts recounted in this section are taken from the Findings of Fact in ALJ Carroll's January 23, 2010 Administrative Decision, ECF Dkt. 23-10.

psychiatric report to rule out IDEA eligibility based upon emotional disturbance." (*See* Administrative Decision at ¶ 4.)

ALJ Carroll also found that "between [O.M.'s] return to school in the fall of 2005, after discharge from the hospital, and the Spring of 2008, [O.M.] had no problem attending school, expressed no concerns about school generally and maintained grades in the B-C range." (*See* Administrative Decision at ¶ 5.) She found that Defendant's psychologist "periodically saw [O.M.] during the first part of the 2005/2006 school year, just after the first hospital stay, and found no basis for any additional evaluation for IDEA eligibility at any time during that period." (*See* Administrative Decision at ¶ 5.)

ALJ Carroll found that in April 2008, O.M. was again hospitalized after he overdosed on prescription medicine. (*See* Administrative Decision at ¶ 6.) She found that Plaintiff notified Defendant of the incident, "but provided no details or medical records." (*See* Administrative Decision at ¶ 7.) ALJ Carroll then found that in July 2008, O.M. was twice hospitalized for extreme emotional upset, "manifested by suicide threats and gestures and a suicide attempt." (*See* Administrative Decision at ¶ 7.) She noted that other suicide attempts followed. (*See* Administrative Decision at ¶ 8.) Plaintiff notified Defendant, ALJ Carroll wrote, in August 2008 that O.M. "was withdrawing from the District to attend a private boarding school" attended by Student's older brother. (*See* Administrative Decision at ¶ 9.) ALJ Carroll found that Defendant supported Plaintiff's decision, "wrote a letter of recommendation for [O.M.] and supplied teacher evaluation forms." (*See* Administrative

Decision at ¶ 9.) ALJ Carroll acknowledged, however, that after one day at the boarding school, Plaintiff withdrew O.M. after O.M. indicated that he felt depressed and was going to harm himself. (See Administrative Decision at ¶ 10.) ALJ Carroll found that Parents re-enrolled O.M. in the District before the 2008-2009 academic year commenced. (See Administrative Decision at ¶ 10.)

The Administrative Decision indicated that in early September 2008, O.M. expressed suicidal thoughts, and was admitted to the hospital for an overnight stay. (See Administrative Decision at ¶ 11.) The Administrative Decision further indicated that Plaintiff notified Defendant of O.M.'s "hospitalization for depression and sought assistance for low academic performance during the fall of 2008." (See Administrative Decision at ¶ 11.) ALJ Carroll found that "[a]fter the September 2008 hospitalization, Plaintiff requested that Defendant provide an IEP for [O.M.]." (See Administrative Decision at ¶ 12.) O.M. then "enrolled in several honors math classes for [the] 11th grade" (2008-2009) academic year. (See Administrative Decision at ¶ 13.) Previously, O.M. took college prep level classes, "but no honors classes." (See Administrative Decision at ¶ 13.) ALJ Carroll found that "[t]hroughout high school, [O.M.] generally maintained" a B-C grade point average. (See Administrative Decision at ¶ 14.) ALJ Carroll recognized that Plaintiff obtained private tutoring for O.M. in various subjects in which O.M. was having difficulty. (See Administrative Decision at ¶ 14.) She further recognized that "[O.M.] was also enrolled in District in-school

tutoring programs during the 2007-2008 and 2008-2009 school years." (*See* Administrative Decision at ¶ 15.)

ALJ Carroll found that in the early part of the 2008-2009 school year, O.M. was struggling with the demands of his academic regimen. (*See* Administrative Decision at ¶ 16.) O.M. dropped the honors classes, and his grades improved in the second quarter. (*See* Administrative Decision at ¶ 16.) Grade reports from the 2008-2009 school year reflect final grades for the first quarter only, as second quarter grades extend only to the date O.M. withdrew from the District and "may reflect missed tests and/or assignments that could have been made up had [O.M.] returned to complete the [second] quarter." (*See* Administrative Decision at ¶ 16.) ALJ Carroll found that "[i]n mid-October 2008, Defendant received letters from [O.M.'s] treating physicians notifying [Defendant] that [O.M.] was being treated for depression, had also been diagnosed with ADHD, and requesting accommodations." (*See* Administrative Decision at ¶ 17.) The Administrative Decision noted that upon receiving these letters, Defendant requested and received permission from Plaintiff to conduct an evaluation to determine whether O.M. was a protected handicapped student under Section 504 of the Rehabilitation Act, and if so, to determine the services he needed. O.M. was then hospitalized in November 2008 after another suicide attempt. (*See* Administrative Decision at ¶ 18.)

ALJ Caroll further noted that "[i]n mid-November 2008, Defendant offered, and Plaintiff approved, a § 504 Service Agreement that provided for some classroom/testing

accommodations and the opportunity to contact the nurse and guidance staff for needs

associated with [O.M.'s] mental health and ADHD diagnoses." (*See* Administrative

Decision at ¶ 20.) "Mental health therapy was to be home-based, provided by a mobile

therapist." (*See* Administrative Decision at ¶ 20.) The Administrative Decision indicated

that on at least two occasions in the fall of 2008, O.M. became upset, spoke to guidance,

and Plaintiff was asked to bring O.M. home. (*See* Administrative Decision at ¶ 21.) ALJ

Carroll found that "[o] therwise, O.M. attended and participated in all classes and was

observed during lunch and free periods sitting" with peers and other students considered

popular. (*See* Administrative Decision at ¶ 21.) She noted that during the fall of 2008,

Plaintiff explored residential treatment facilities for O.M. (*See* Administrative Decision at ¶

22.) ALJ Carroll further found that before school re-opened in January 2009, O.M. again

"threatened suicide and received in-patient hospital treatment." (*See* Administrative

Decision at ¶ 23.) She found that "[o]n January 12, 2009, Plaintiff transported [O.M.] to

Wediko Children's Services, a therapeutic/residential treatment center in New Hampshire,

where [O.M.] remained until July 2009." (*See* Administrative Decision at ¶ 24.)

The Administrative Decision indicated that at Wediko, O.M. received a full school day

and daily therapy. (*See* Administrative Decision at ¶ 25.) It further noted that O.M. was

overseen by a staff psychologist, (*see* Administrative Decision at ¶ 27), and that O.M. did

not begin classes for the first 2-3 weeks after admission. (*See* Administrative Decision at ¶

28.) "The school day included three 'debriefing' periods in which O.M. was assessed on

how well he was maintaining control of his thoughts, mood, and anxiety related to interpersonal relationships." (*See* Administrative Decision at ¶ 28.)  Academic classes were small, with a high staff-to-student ratio, and grading was reported on a pass/fail basis. (*See* Administrative Decision at ¶ 28.)  The program also included time for sports, community service, and SAT prep. (*See* Administrative Decision at ¶ 29.)

ALJ Carroll found that "Wediko evaluated O.M. beginning in February 2009." (*See* Administrative Decision at ¶ 30.)  She further found that "the evaluation consisted of standardized cognitive and academic achievement tests and measures designed to assess social-emotion functioning." (*See* Administrative Decision at ¶ 30.)  ALJ Carroll recognized that "[w]hen Wediko notified [Defendant] that [Plaintiff] placed [O.M.] there and suggested that an IEP be considered, [Defendant] reviewed the testing of [O.M.] completed by Wediko and met with the family." (*See* Administrative Decision at ¶ 31.)  ALJ Carroll found that "[t]he Wediko clinical psychologist participated in the review of the testing," (*see* Administrative Decision at ¶ 31), and that Defendant "accepted the Wediko test results indicating that [O.M.] is in the average range of intellectual functioning, with average to above average achievement scores in math, reading, and writing." (*See* Administrative Decision at ¶ 32.)  ALJ Carroll further found that Defendant "also accepted the Wediko diagnosis of emotional disturbance, but rejected the conclusion that [O.M] has a non-verbal learning disability." (*See* Administrative Decision at ¶ 32.)  The Administrative Decision noted that "[a]t an IEP meeting held in May 2009, [Defendant] offered an IEP for [O.M.] that

proposed emotional support annual goals, and provided emotional support services via specially designed instruction and related services in the form of weekly social work services." (See Administrative Decision at ¶ 33.) It further found that "[d]uring the summer of 2009, based upon additional recommendations received from Wediko and research conducted by the District school psychologist, additional emotional support services and specially designed instruction were added to the proposed IEP, including a cognitive behavioral curriculum for students experiencing anxiety and depression." (See Administrative Decision at ¶ 34.) ALJ Carroll held that "[t]he curriculum is designed to meet Wediko recommendations concerning appropriate supports for [O.M.]." (See Administrative Decision at ¶ 34.) She further held that "[b]etween the May 2009 IEP meeting and a meeting in September 2009, [Defendant] also increased social work services and added psychological services." (See Administrative Decision at ¶ 34.) ALJ Carroll's Decision also noted that Defendant's IEP proposals "incorporated most of the Wediko service and support recommendations via specially designed instruction and related services. (See Administrative Decision at ¶ 34.) It continued to note that "[b]oth the original and the revised IEPs proposed by [Defendant] provided for [O.M.] to receive all academic instruction in regular education high school classes." (See Administrative Decision at ¶ 35.) ALJ Carroll found that Plaintiff rejected the proposed IEP offered "at the May 2009 meeting because it did not provide the level of counseling and mental health treatment [O.M.] was receiving at Wediko." (See Administrative Decision at ¶ 35.)

14

ALJ Carroll also found that "[d]uring the summer of 2009, [Plaintiff] and Wediko determined that [O.M.'s] level of risk had decreased to the point that [O.M.] could function without the intensive therapeutic environment offered by Wediko, but should attend a residential school closer to home that offered small classes and a supportive environment." (See Administrative Decision at ¶ 36.) She continued to note that "[i]n September 2009, after the due process complaint was filed, [Plaintiff] again rejected the IEP proposed by [Defendant] and subsequently asserted a claim for [Defendant] to reimburse [Plaintiff] for [O.M.'s] tuition at The Phelps School, a private boarding school located in Malvern, PA." (See Administrative Decision at ¶ 37.) ALJ Carroll determined that Plaintiff "unilaterally enrolled [O.M.] at Phelps for the 2009/2010 school year" (see Administrative Decision at ¶ 37), and that Phelps is a "Pennsylvania Department of Education licensed private school." (See Administrative Decision at ¶ 38.) She further determined that "[t]he school has also been licensed to offer special education summer programs in speech and language in the past." (See Administrative Decision at ¶ 38.) The Administrative Decision noted that O.M. "began the 2009-2010 year repeating 11th grade," but "academic support was discontinued after a brief period" and O.M. began attending regular classes. (See Administrative Decision at ¶ 40.) It further noted that at the time of the filing of this action, O.M. was progressing to the point where he may have been graduated to the 12th grade. (See Administrative Decision at ¶ 40.) Finally, ALJ Carroll found that O.M. also received "psychological therapy

from a private therapist contracted by the school, and counseling from the school's social

worker and/or school psychologist." (See Administrative Decision at ¶ 41.)

### ALJ Carroll's Conclusions of Law[3]

Defendant's obligation to O.M. and Plaintiffs under the IDEA is to assure that O.M.

received a free, appropriate public education ("FAPE"). ALJ Carroll analyzed the findings of

fact in light of the Bd. of Educ. v. Rowley, 458 U.S. 176 (1982), framework. A child is

eligible for services under IDEA only if he or she is diagnosed with one or more of the

conditions listed and defined in the IDEA statute and regulations, and "by reason thereof,

needs special education and related services." ALJ Carroll acknowledges that O.M. has

struggled with severe emotional issues since middle school, but

> it is not enough for parents to establish the existence of a condition that
> meets the criteria for a disabling condition as defined in the statute. Parents
> are also required to establish that the condition adversely affected Student's
> educational progress. Parents did not present convincing evidence that
> Student had persistent academic or social problems in the school setting at
> any time between returning in the fall of 2005, after the first hospitalization,
> and the fall of 2008 . . . . By parent's own testimony, Student had no problem
> attending school and expressed no concerns about school between 2005 and
> the spring of 2008.

(See Administrative Decision at 10-11.)

Although the record is unclear as to whether Plaintiff explicitly notified Defendant

about O.M.'s second hospitalization, ALJ Carroll proceeded with an analysis that assumed

such notification. "Even completely crediting Parents' testimony that they did make the

---

[3]ALJ Carroll's conclusions of law are incorporated in this opinion for the purpose of providing background to the present review of the administrative record, as they are entitled to no deference from this Court. The findings in this section are taken from ALJ Carroll's Administrative Decision of January 23, 2010.

District aware of that incident, however, a hospital admission that occurred more than three years after the first such incident was insufficient to trigger an immediate evaluation for emotional disturbance." (*See* Administrative Decision at 11.)   ALJ Carroll found that there was no indication that the O.M.'s school performance was adversely affected between 2005 and 2008, since O.M. generally maintained average grades during that period.  She further found that there is also no evidence, "other than Parents' testimony reporting concerns [O.M.] expressed to them, of any difficulties with interpersonal relationships." (*See* Administrative Decision at 14.)  Consequently, despite the hospital admission in April 2008, ALJ Carroll found that there was no basis for the District to suspect at that time that O.M. "fit the statutory/regulatory criteria for emotional disturbance, and, therefore, to suggest that a new evaluation might be advisable." (*See* Administrative Decision at 15.)

According to ALJ Carroll, the question as to whether Defendant had notice as to O.M.'s worsening condition becomes clearer after the District learned of additional hospitalizations between September and November 2008.  However, she said, even if Defendant "should have initiated an IDEA evaluation at the time the parents requested an IEP, there would have been insufficient time to complete an evaluation, develop an IEP, and begin delivering services prior to the 'crisis' that caused parents to unilaterally withdraw O.M. from school in January 2009." (*See* Administrative Decision at 15.)

With regard to whether Plaintiff is entitled to reimbursement for Wediko, ALJ Carroll held that the facts are not in dispute, and as a matter of law, reimbursement was not

permitted. Defendant, she held, is under no obligation to pay for the services O.M. received

at the private facility when the basis for the O.M.'s admission there was a medical/mental

health crisis that required immediate treatment. Citing the Third Circuit's holding in *Mary*

*Courtney T. v. School District of Philadelphia*, 575 F.3d 235 (3d Cir. 2009), ALJ Carroll

determined that the primary purpose of O.M.'s residential placement was not education, but

mental health treatment. Reimbursement to Plaintiff is only permitted if O.M.'s placement in

the residential facility was necessary primarily to provide appropriate educational services.

ALJ Carroll found that this was clearly not the case. ALJ Carroll relied upon the testimony

from parents and other witnesses from Wediko that O.M. needed to attend Wediko in order

to keep him safe from the effects of depression, which led to suicidal threats and gestures

while he was living at home. "Because the inescapable conclusion from the record is that

the Wediko placement was primarily for medical not educational purposes, there is no legal

basis for making [Defendant] financially responsible for the costs associate[d] with that

placement." (*See* Administrative Decision at 16.)

With regard to whether Plaintiff is entitled to reimbursement for a parentally selected

private school placement, ALJ Carroll again answers in the negative. She applied a three-

part test pursuant to *Burlington Sch. Committee v. Dep't of Educ. of Massachusetts*, 471

U.S. 359 (1985) and *Florence County Sch. Dist. v. Carter*, 510 U.S. 7 (1993). "The first step

is to determine whether the program and placement offered by the school district is

appropriate for the child, and only if that issue is resolved against the School District are the

second and third steps considered, i.e., is the program proposed by the parents appropriate

for the child and, if so, whether there are equitable considerations that counsel against

reimbursement or affect the amount of relief." (*See* Administrative Decision at 13.) "A

decision against the parents at any step of the process results in a denial of

reimbursement." (*Id.*)

ALJ Carroll found that the inquiry into the first question, namely, whether Defendant

should be required to reimburse Plaintiff for the costs of private school placement attended

by O.M. during second half of the 2008-2009 academic year, are questions of law, not fact.

(*See id.*) "The dispute over reimbursement for [O.M.'s] stay at Wediko centers on the limits

of the District's obligation to pay for the services O.M. received at the private facility when

the basis for the O.M.'s admission there was a medical/mental health crisis that required

immediate treatment." (*Id.*) ALJ Carroll again viewed the matter through the lens of *Mary*

*Courtney T., supra*, in which the Court of Appeals "explained that in deciding whether a

school district is responsible for paying the costs of a unilateral residential placement that

provides both treatment and education, it is essential to determine whether its primary

purpose is providing special education or mental health treatment." (Administrative

Decision at 13.) ALJ Carroll noted that a school district can be responsible for the expenses

of a student's stay at a facility "only if placement there was necessary primarily to provide

appropriate educational services." (*Id.* at 14.) ALJ Carroll held that this "was clearly not the

case." (*Id.*)

The testimony of Parent and the witnesses from Wediko emphasized that Student needed to attend Wediko in order to keep him safe from the effects of depression, which led to suicide threats and gestures when he was living at home.   Moreover, the description of the Wediko programs and services establish that the Student's services were based upon a treatment plan designed by a clinical psychologist, and were not primarily focused on education.

(*Id.* (internal citations omitted).)  ALJ Carroll found that the record presented inescapable facts that demonstrated that the primary reason for O.M.'s placement at Wediko was for medical, and not educational, purposes.  (*See id.*)

    ALJ Carroll further analyzed whether Plaintiff is entitled to reimbursement for tuition at the parentally selected boarding school.  "Parents are entitled to tuition reimbursement for a parentally selected private school placement only if the District has failed to offer an appropriate IEP."  (*Id.*)  The first consideration is whether the IEP offered by the District meets the needs of the student.  (*See id.*)  In the present matter, ALJ Carroll found that "[t]he evidence established that the District took into account [O.M.'s] emotional support needs as identified in the Wediko evaluation and incorporated virtually all of the Wediko recommendations into its offer of an educational program."  (*Id.*)  She further found that "[Plaiantiff] did not fault the specifics of the District's proposal, relying again on the therapeutic benefits to [O.M.] of a (sic) smaller classes and the availability of counseling services."  (*Id.*)  Students are entitled, however, to an appropriate education, not an ideal education.  ALJ Carroll noted that "[Plaintiff] is not entitled to tuition reimbursement because [he] prefer[s] the advantages of a private school."  (*Id.*)

ALJ Carroll further found that "although the record as a whole supports the conclusion that the symptoms of emotional disturbance subside when his educational setting includes a residential component, there is . . . no legal basis for requiring the District to pay for services that amount to mental health treatment." (Id. at 15.) "The record suggests that it is residing at the private school that is the key to the absence of suicide threats, gestures and attempts since January 2009 rather than the educational services [O.M.] receives." (Id.)

Finally, ALJ Carroll notes that "the description of [O.M.'s] progress at Phelps establishes that while [O.M.'s] grades may be somewhat better than in the public school, he still struggles with the effects of depression, struggles with math and needs tutoring services." (Id.) "There is no evidence," she continues, "that the educational program the District has offered, including the services and curriculum to address [O.M.'s] emotional support needs will not effectively address those needs and afford [O.M.] the opportunity for significant learning." (Id.) ALJ Carroll determined that there was no objective basis for determining that The Phelps School provided a better alternative for O.M. aside from the residential component. Accordingly, ALJ Carroll found that the record provided no basis for ordering Defendant to reimburse parents for tuition at the private residential school.

## IV. DISCUSSION

Plaintiff claims his son was denied a FAPE as a result of Defendant's alleged failure to recognize and address O.M.'s need for specific educational adjustments tailored to his

21

emotional problems, and therefore, insists that Defendant must compensate him for tuition spent after Plaintiff unilaterally enrolled O.M. in two private schools. While IDEA requires a FAPE, here, Plaintiff is not entitled to the remedies requested because O.M. was not denied a FAPE, and that is true because the schools where Plaintiff sent O.M. for which he seeks reimbursement, had as their primary purpose, a medical, rather than an educational objective.

ALJ Carroll's Decision involved four primary questions: (1) did Defendant fail to timely identify Student as eligible for special education services at any time between the 2004-2005 academic year and the time an evaluation was completed during the 2008-2009 academic year; (2) is Student entitled to an award of compensatory education for any period of time from the beginning of the 2007-2008 school year through December 2008, and if so, for what period and in what amount; (3) is Plaintiff entitled to reimbursement for the costs associated with Student's placement at Wediko services from January 2009 through discharge in July 2009; and (4) is Plaintiff entitled to reimbursement for Student's tuition at The Phelps School for the 2009-2010 school year?  The Court will address each issue in turn, as well as other ancillary matters raised by the parties or those necessarily arising from ALJ Carroll's Decision.

A.  Consideration of "Additional Evidence"

The Court's analysis of the propriety of the administrative decision is predicated upon the standard of review set forth at the beginning of this memorandum; thus, ALJ

Carroll's findings of fact are accorded "due weight," and her findings of law are given no deference. In particular, the Court's consideration of new evidence under §1415(i)(2)(C)(ii) is undertaken in light of our ability to "accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." *S.H.*, 336 F.3d at 270.

In the present matter, the Court considered several evidentiary additions to the already developed administrative record, but none of this additional evidence casts doubt upon the accuracy of ALJ Carroll's findings, or the factual basis underlying them. The Court considered the expert reports submitted by Plaintiff and Defendant, in addition to supplemental educational records provided by Plaintiff.

Plaintiff's expert report ("Demidont Report") was generated by Mr. Andy Demidont ("Demidont") of SERAPH, and details in narrative form the reasons why Plaintiff is entitled to reimbursement of educational expenses under IDEA. (Demidont Report, ECF Dkt. 28-3.) The Demidont Report argues that (1) Defendant's IEP and program were defective, thus requiring the reimbursement for funds spent on private schooling; and (2) the two parental placements of O.M. in private schools were appropriate and achieved successful results. The Demidont Report further insists that Plaintiff is unsophisticated in public school protocol and believed that Defendant was acting in accordance with O.M.'s best interests. Furthermore, Plaintiff submitted extensive educational records concerning O.M.'s performance in school and on standardized tests. This additional evidence fails to provide

any basis to abrogate the findings of fact listed by ALJ Carroll in her Decision. In fact, the additional evidence supports the ALJ's findings, especially with regard to her finding that until the spring of 2008, O.M. "had no problem attending school, expressed no concerns about school and generally maintained grades in the B-C range." (See ALJ Decision, ECF Dkt. 23-10, at 3.) O.M. finished the 2007-2008 academic school year with grades of two A's, three B's, and two C's. (See O.M.'s Permanent Transcript at 16, ECF Dkt. 28-2.) This comports with ALJ Carroll's findings that, for the years leading up to, and including the beginning of 2008, O.M. was achieving grades of B's and C's. Although O.M's grades did decline, the first significant indication that O.M. was experiencing severe academic difficulty did not occur until the fall of 2008. At that time, Defendant informed Plaintiff that O.M. may be entitled to legal protections extended to children with educational disabilities under the Rehabilitation Act.

Defendant's expert report ("Schwilk & Bateman Report") was generated jointly by Christopher L. Schwilk, Ph.D., and David F. Bateman, Ph.D. (Schwilk & Bateman Report, ECF Dkt. 31-4.) Like the Demidont Report, the Shwilk & Bateman Report provided no reason to dismiss any of ALJ Carroll's findings of fact. Instead, it merely recounted the reasons that ALJ Carroll's findings should be upheld, and like the Demidont Report, amounted to little more than a quasi-judicial type review of the administrative findings. Under the present circumstances, neither report vitiates the findings of ALJ Carroll.

Similarly, nothing in the additional academic records or educational history of O.M. submitted by Plaintiff supports his contention that Defendant should have identified O.M. as having a learning disability as early as 2002. For instance, these records indicate that O.M. achieved slightly less than average test scores; however, many of the records indicate that O.M. achieved above-average marks on quarterly progress reports, including several A's and B's. (*See, e.g.,* O.M.'s November 4, 2002 Report Card, ECF Dkt. 28-1, at 9.) O.M.'s testing further indicated problems relating to his learning and use of English as a second language ("ESL"); however, ESL classes were recommended by Defendant to address this issue. (*See* ESL Recommendation, ECF Dkt. 28-1, at 12.) Nothing in the additional evidence suggests that Defendant should have provided O.M. with any special assistance beyond that which was already provided to him. It is also noteworthy that substantial portions of Plaintiff's additional evidence contain teacher evaluations that commend O.M.'s academic ability and rate him as an above-average student, while expressing concern over O.M.'s emotional instability. (*See, e.g.,* Mathematics Teacher's Evaluation for 2007-2008, ECF Dkt. 28-1, at 79.)[4]

---

[4] It must further be noted that Plaintiff agreed with Defendant's September 6, 2005 report on O.M. in which the student was found to be ineligible for special benefits. Plaintiff indicated, when he affixed his signature to the report, that he concurred with Defendant's decision, and did not object to Defendant's finding that O.M. was not qualified for special education services. This report contained one set of standardized testing scores reflecting percentile rankings as follows: (1) Academic Fluency (79%); (2) Reading Fluency (60%); (3) Math Fluency (98%); and (4) Writing Fluency (90%). Other standardized tests showed more varied results, but O.M. was often within an average percentile range. The report further included O.M.'s final grades for the 2004-2005 academic year, which are as follows: (1) English – B; (2) Math – B; (3) Science – A; and (4) Social Studies – C. *See* Pottsville Area School District Initial Evaluation Report, September 6, 2005, ECF Dkt. 23-9, at 86-93.

B. Alleged Child Find Violations and Compensatory Education for 2007 - 2008

The question of whether Defendant failed to timely identify O.M. as being entitled to special educational services under IDEA involves two "distinct" time periods: first, the time after O.M.'s first hospitalization in 2005 until his subsequent hospitalization at the end of April 2008, and then from May 2008 through the time at which Defendant found O.M. eligible for IDEA services. The Court addresses each.

Pursuant to 20 U.S.C. § 1401(3)(A), 34 C.F.R. § 300.8(a), a child is eligible for IDEA services only if he or she is diagnosed with a specific statutory condition, and "by reason thereof, needs special education and related services."[5] It is insufficient that the child merely has a statutorily recognized condition, as there must be a causational nexus between that condition and the child's educational progress. *See id.* Without evidence of educational performance issues, the diagnosis of a recognized condition is inadequate to trigger IDEA protections.

With regard to the first time period, Plaintiff contends that Defendant should have been aware of O.M.'s alleged educational problems in or around 2005, following his first hospitalization for mental health issues. As ALJ Carroll notes, however, not only must O.M. be diagnosed with a qualifying condition, but by reason of that condition he must need

---

[5] Under 34 C.F.R. § 300.8(a), a child is deemed to have a disability if he has been diagnosed with an "emotional disturbance." Furthermore, an "emotional disturbance" is "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors. (B) An inability to build or maintain satisfactory interpersonal relationship with peers and teachers. (C) Inappropriate types of behavior or feelings under normal circumstances. (D) A general pervasive mood of unhappiness or depression. (E) A tendency to develop physical symptoms or fears associated with personal or school problems." 34 C.F.R. § 300.8(c)(4)(i).

26

special education or related services. *See* 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(a). It

is beyond argument that O.M. suffered from a qualifying emotional condition, but Plaintiff

does not demonstrate that such a condition adversely affected O.M.'s educational progress.

As the record indicates, O.M. maintained average grades from 2005 until the fall of 2008.

ALJ Carroll correctly applied Plaintiff's own testimony to show that O.M. had no issues

attending school and did not express concerns about school between 2005 and the spring

of 2008. (*See* Due Process Hearing Testimony of Muhammad Munir at 52-53, ECF Dkt. 23-

2.) Although the record is unclear as to whether Plaintiff specifically notified Defendant of

O.M.'s hospitalization in April 2008, even if the Court accepts Plaintiff's testimony that he did

make Defendant aware of the incident, this alone does not establish that O.M. should have

been reevaluated under IDEA, as the record indicates that O.M. showed no outward signs

of academic troubles until the following autumn. Defendant was aware of a hospitalization

in 2005, and ALJ Carroll reasonably finds that the report of a second incident, three years

later, is insufficient to trigger another, immediate evaluation for emotional disturbance.

There is no evidence, anywhere in the record, that indicates O.M. was struggling with

academics until late 2008. While crediting ALJ Carroll's findings of facts in this matter, the

Court is independently convinced that Defendant was not delinquent in its obligations to

identify O.M. as possibly qualifying for benefits under IDEA.[6]

---

[6] Defendant contends that a statute of limitations restricts any claim for compensatory education or
reimbursement from being decided by a court if the alleged facts giving rise to the complaint occurred more than
two years prior to the filing of a due process hearing complaint notice. *See* 20 U.S.C. § 1415(f)(3)(C). This statute
of limitations applies to any cause of action occurring after July 1, 2005. Plaintiff filed its Due Process Complaint
Notice on August 12, 2009 (*see* ECF Dkt. 23-1); accordingly, the Court will not consider any claim based upon

Furthermore, when Defendant learned of O.M.'s subsequent hospitalizations in September and November of 2008, it obtained Plaintiff's permission to commence a Rehabilitation Act Section 504 evaluation of O.M. Plaintiff argues that although he agreed to the Section 504 plan later offered by Defendant, the plan was inadequate because it "offered no mental health services, other than visits to the guidance office when O.M. felt he needed help." (*See* Pl.'s Am. Statement of Mat. Facts at ¶ 77.) Defendant did not offer an IEP at this time. Nevertheless, even if the Court assumes, *arguendo*, that Defendant was required to develop an IEP in the fall of 2008, Defendant did not have enough time to commence services under a proposed plan before Plaintiff unilaterally removed O.M. from the school district to preserve his physical safety.[7] See 22 Pa. Code § 14.123(b)(evaluations must be completed within 60 days after receiving a signed permission to evaluate); 34 C.F.R. § 300.323(c)(initial IEP meeting must be held within 30 days of eligibility determination). Pursuant to 34 C.F.R. § 300.513(a)(2), Plaintiff can only claim a procedural violation of IDEA if the alleged procedural inadequacies: "(i) [i]mpeded the child's right to a FAPE; (ii) [s]ignificantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) [c]aused a deprivation of educational benefit." The Court agrees with ALJ Carroll's holding that "even if the District should have sought an IDEA evaluation in the fall of 2008, the delay

---

incidents arising between July 1, 2005 and August 12, 2007. Claims arising prior to July 1, 2005 are not subject to the limitations period.

[7] Plaintiff asserts that he requested O.M. be evaluated for an IEP in October of 2008. *See* Pl.'s Am. Statement of Mat. Facts at ¶ 59. ALJ Carroll's findings of fact, however, indicate that Plaintiff requested an IEP as early as September of 2008.

had no substantive effect in terms of impeding development of a timely IEP or resulting in a denial of educational benefit. . . ." (*See* Administrative Decision at 12.) Thus, because any alleged procedural inadequacies could not have prevented O.M. from receiving a FAPE given his removal from the school district for psychological treatment following a suicide attempt, Plaintiff is not entitled to compensatory education for the 2007-2008 school year, through and including December of 2008.

Case law from within the Third Circuit does not contradict this finding. Applying the Third Circuit's decision in *Dutkevitch v. Pennsylvania Cyber Charter Sch.*, 439 F. App'x 177 (3d Cir. 2011) , the district court in *I.H. v. Cumberland Valley Sch. Dist.*, __ F. Supp. 2d __, 2012 WL 400686 (M.D. Pa. Feb. 8, 2012) held that although IDEA does "not require the school district of residence to provide a FAPE to an [un-enrolled] student residing in its district," the local school district is not relieved of its duty to provide an IEP if the "parent either re-enrolls their child in the public school or requests evaluations with the intention of re-enrolling the student. . . ." *Id.* at *8 (citing *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1073 (D.N.J. 2011)("[W]here parents either re-enroll their child in public school or request evaluations so they can re-enroll him, the district must evaluate and develop an IEP for that child for purposes of proposing a FAPE.")).

The present matter, however, is distinguishable from *Cumberland, supra*. Here, Plaintiff unilaterally withdrew O.M. from the district, and did not continue to request an IEP at that time. Furthermore, the record does not indicate that Defendant had any notice in

January 2009 that Plaintiff was seeking to re-enroll O.M. in the district, and Plaintiff's own submissions to this Court indicate that he was looking for a residential program in which to place O.M. throughout the fall of 2008. Defendant's teachers even provided recommendations for O.M. to attend a private, residential school in which O.M.'s siblings had been enrolled. Finally, as stressed throughout this memorandum, the record does not show that O.M. had any academic troubles at the time Plaintiff made the request for an IEP in late September or early October of 2008. On this last point alone, it is clear that O.M. was not denied a benefit to which he was entitled under IDEA.

## C. Reimbursement for Unilateral Placement Into Residential Schools

Plaintiff maintains that he is entitled to reimbursement for tuition he paid to both Wediko and The Phelps School, and that the IEPs offered by Defendant in 2009 did not provide any meaningful educational benefit to O.M.

### 1. Propriety of Wediko Tuition Reimbursement

Plaintiff argues that he is entitled to reimbursement for educational expenses incurred when he enrolled O.M. at Wediko for the second half of the 2008-2009 academic year. As previously noted, Wediko is a private, boarding school in New England designed for male students with emotional and psychological problems. Although it is undisputed that O.M. received substantial academic support during his time there, the record is clear that O.M. did not attend Wediko primarily to address educational issues.

In *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687 (3d Cir. 1981), the Third

Circuit acknowledged that "the concept of education is necessarily broad . . . ." *Id.* at 693.

In that case, however, the Court acknowledged that not every therapeutic service can be

construed as being educational for the purposes of classifying children under the IDEA. *Id.*

at 694.  There are necessary limits because "ultimately any life support system or medical

aid can be construed as related to a child's ability to learn." *Id.*  To determine IDEA

eligibility, then, courts must "assess the link between the supportive service or educational

placement and the child's learning needs." *Id.*

In *Mary Courtney T.*, the Third Circuit, relying on *Kruelle*, provided further guidance:

> [W]e . . . considered "whether full-time placement may be considered
> necessary for educational purposes, or whether the residential placement is a
> response to medical, social or emotional problems that are segregable from
> the learning process." [*Kruelle*, 642 F.2d at 693.]  If the placement was
> required by the former, the school was obligated to bear the cost; if the
> placement was necessitated by the latter, the costs of the placement was "the
> responsibility of the parents or social service agencies." [*Id.* at 693-94.]  And
> to differentiate between the two possible predicates to a residential
> placement, the *Kruelle* Court instructed that we are to look at whether the
> "social, emotional, medical and educational problems . . . [are] so intertwined
> that realistically it is not possible for the court to perform the Solomon-like
> task of separating them." [*Id.* at 694 (internal quotation and citation omitted).]
> The *Kruelle* panel concluded: "The relevant question in the present case is
> whether residential placement is part and parcel of a specially designed
> instruction to meet the unique needs of a handicapped child." [*Id.*]

*Marty Courtney T.*, 575 F.3d at 243-44.

The *Kruelle* panel, applying this framework, held that the child's emotional and

medical needs were not severable from his educational needs. "[H]ere, consistency of

31

programming and environment is critical to [the child's] ability to learn, for the absence of a structured environment contributes to [the child's] choking and vomiting which, in turn interferes fundamentally with his ability to learn." *Kruelle*, 642 F.2d at 694.

The facts underpinning the present matter are substantially different from those presented in *Kruelle* because, here, O.M. was achieving average grades until the fall of 2008, whereas in *Kruelle*, the child struggled to perform basic functions such as dressing himself, walking, eating unaided, using a toilet, or communicating clearly. *See id.* at 688-89. Testimony presented at the administrative hearing demonstrates that O.M.'s parents feared for his personal safety, and that he posed a physical threat to himself. (*See Pl.'s Am. Statement of Mat. Facts* at ¶ 88 ("When O.M. first arrived at Wediko he was placed on suicide watch.").) Although O.M. undoubtedly benefitted from the educational opportunities offered by the residential placements, these educational benefits were subsidiary to the therapeutic and emotional benefits O.M. received in an effort to prevent another suicide attempt. Federal regulations only require residential "placements which are made by public agencies for educational purposes." *Kruelle*, 642 F.2d at 692. The clear purpose of O.M.'s residential placement was to prevent harm to O.M. and the educational benefits derived from such placements were secondary to treating O.M.'s severe emotional issues. "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care room and board, must be at no cost to the parents of the child." *Mary*

*Courtney T.*, 575 F.3d at 244 (citing 34 C.F.R. § 300.104). In the present matter, the purpose of the residential placements was not primarily for O.M.'s educational benefit.

The substantial precedent cited herein thus shows that in cases in which reimbursement for the unilateral placement of a student in private school for both educational and psychological purposes is the issue, the critical element of the analysis should be to determine whether the primary purpose of the placement is for special education or mental health treatment. *See Mary Courtney T.*, 575 F.3d. at 245. A school district is only responsible to provide financial support for a private placement if the stay at that facility is necessary primarily to provide educational services. The record clearly indicates that O.M. was placed at Wediko to treat severe emotional and psychological problems, and although he received an education while at Wediko, he was not placed there primarily for educational purposes. Even O.M.'s discharge papers following his January 7, 2009 suicide attempt state that although O.M. did not like his school in Pottsville, he did well academically. (*See* Pl.'s Am. Statement of Mat. Facts at ¶ 85.) Furthermore, Plaintiff's own testimony, along with the testimony of witnesses from Wediko, emphasized that O.M. needed to be housed at Wediko in order to prevent him from harming himself. (*See* Pl.'s Am. Statement of Mat. Facts at ¶ 105 ("O.M.'s doctors recommended against O.M. returning home for safety reasons.").) In addition, the description of O.M.'s program at

Wediko indicates that he was treated in accordance with a plan designed by a clinical psychologist, and was not primarily concerned with O.M.'s education.[8]

## 2. The Proposed IEPs Conferred An Educational Benefit Under IDEA

While O.M.'s parents should be commended for the care and energy they have devoted to their child's educational and emotional needs, the Court must be vigilant to adhere to IDEA's mandate that a child is entitled to a "free appropriate public education," in the least restrictive environment, and not an ideal education. While O.M.'s IEP "must be sufficient to confer some educational benefit upon" him, *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006), the state's obligation is not without limits, nor is it required to "maximize the potential of handicapped children." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)(internal quotations omitted). The IDEA only mandates a "basic floor of opportunity." *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995). To accomplish this, an IEP must only "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009)(quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)). While the Court sympathizes with Plaintiff, the evidence as it was evaluated by ALJ Carroll, and by this Court on *de novo* review, proves by a preponderance of the evidence that O.M. received the educational benefits to which he was entitled. *See* 20 U.S.C. §

---

[8] "Wediko provided the special education O.M. needed, including a restrictive residential environment with 24 hour emotional support, academic and emotional supports, counseling, small class sizes, and stress management." Pl.'s Am. Statement of Mat. Facts at ¶ 101.

1415(i)(2)(C)(instructing courts to use preponderance of evidence standard in evaluating IDEA cases).

In 2009, it was determined that O.M. was emotionally capable of leaving Wediko, and Defendant agreed that O.M. was now eligible to receive benefits under IDEA. With the assistance of Wediko staff, Defendant drafted an IEP. When Defendant presented the first IEP to Plaintiff in May 2009,[9] and the second IEP in September 2009,[10] Plaintiff did not object to the specifics of either proposal; rather, as the basis for rejecting them, he cited the therapeutic benefits to O.M. of Wediko's emotional support and smaller classes. (*See Am. Statement of Mat. Facts* at ¶¶ 125, 128-131.) Essentially, Plaintiff complained that Defendant's proposed IEP did not provide an ideal program, which was otherwise found in a more restrictive, residential school. (*See id.* at ¶ 101 ("Wediko provided the special education O.M. needed, including a restrictive residential environment with 24 hour emotional support, academic and emotional supports, counseling, small class sizes, and stress management.").) Although smaller classes and a stronger emotional support network may contribute to O.M.'s ability to learn more easily, such factors, by themselves, do not support an IDEA claim for compensatory education and reimbursement.

---

[9] Plaintiff objected to the first IEP because it did not indicate that O.M. had a specific "nonverbal learning disability." *See Am. Statement of Mat. Facts* at ¶ 112, ECF Dkt. 44. Plaintiff further maintains that he objected to the first IEP because it "did not provide a safe place for O.M.'s emotional and educational needs, and asked for mediation." *Id.*

[10] Plaintiff argues that although the terms of the second IEP were an improvement over the first, it still did not provide adequate services. *See Am. Statement of Mat. Facts* at ¶136. Plaintiff avers that the IEP offered an "interventional model" program, and that there was "no evidence in the record whether [Defendant] had the highly trained staff needed for this program, and whether they were prepared to offer it to O.M. in September 2009 or at any other time." *Id.* at ¶¶ 138-39.

The evidence in the record indicates that the IEP offered by Defendant was designed to meet O.M.'s educational and emotional needs. The record further indicates that Defendant worked with Wediko personnel to design the IEP, and that Defendant adopted almost all of Wediko's recommendations. (*See Pl.'s Am. Statement of Mat. Facts* at ¶ 102.) It appears, however, that Plaintiff is not content with this IEP because he prefers the smaller classes and emotional support network found at The Phelps School. The record does not contain a single objection raised by Plaintiff that the IEP fails to confer a meaningful education upon O.M. Again, the IDEA does not require the state to provide an ideal education; thus, under the specific facts of this case, Defendant need not reimburse Plaintiff for O.M.'s tuition at a private residential school.

### 3. Propriety of Reimbursement for Tuition Paid to The Phelps School

Similarly, Plaintiff's unilateral enrollment of O.M. at The Phelps School does not mandate reimbursement. In the summer of 2009, after Wediko's staff found that O.M. no longer required the intense psychological treatment that he was receiving in their facility, they suggested that O.M. be moved to a residential facility closer to home. Plaintiff chose The Phelps School.[11]

Although Plaintiff's narrative is compelling, the evidence contained in the record does not allow for the relief he seeks, as the primary purpose of O.M.'s placement at The Phelps School, like his placement at Wediko, was therapeutic, and not educational. Plaintiff

---

[11] Plaintiff also notes that he was financially unable to continue paying the substantial tuition charged by Wediko.

unilaterally placed O.M. in private schools, and in doing so, assumed the risk that reimbursement would not be forthcoming. While Plaintiff's argument concerning the effectiveness of the private schools in this matter is well-reasoned and reflects sober judgment, the educational mandates of IDEA do not compel Defendant to pay for O.M.'s enrollment in those schools.

Furthermore, the record indicates that Defendant provided two separate IEPs, which were both rejected by Plaintiff. Plaintiff rejected the IEPs, not because of any specific fault contained in the proposals, but because Plaintiff preferred the therapeutic benefits of The Phelps School's smaller classes and counseling services. Given this Court's finding that the IEPs were adequate, and that they conferred a meaningful educational benefit upon O.M., Plaintiff is not entitled to reimbursement for tuition paid to send O.M. to The Phelps School.

## V.    CONCLUSION

For the reasons set forth in this memorandum, the decision of the Pennsylvania Special Education Hearing Officer dated January 23, 2010, will be Affirmed. Defendant's Motion for Summary Judgment will be granted, and Plaintiff's Cross Motion for Summary Judgment will be denied.

DATE: June 14, 2012

Robert D. Mariani
United States District Judge